Dtjeeee, Judge,
delivered the opinion of the court:
This is a claim for retirement benefits. The pertinent facts are as follows:
Plaintiff became a second lieutenant in the Officers’ Reserve Corps in 1936. He served on active duty from August 1,1940, to October 12, 1947, during which time he became a major. Throughout this period of service, plaintiff was afflicted with respiratory ailments. He was often hospitalized. He was examined by three different Disposition Boards, all of which concluded that plaintiff was physically capable of continued service. In December of 1946 plaintiff appeared before a Retiring Board which found that he was not permanently incapacitated for active general service. The Retiring Board recommended general service; the Surgeon General concurred; the Secretary of War approved the findings and recommendation on January 7,1947. After terminal exam *312 inations plaintiff was released from active duty not by reason of physical disability on October 12,1947.
To accumulate active duty time, necessary for eventual longevity retirement, plaintiff reentered active service in October of 1948, and served until March 29, 1950, when lie was again released not for physical disability. All physical examinations undergone by plaintiff during this period indicated his fitness for duty.
In 1951, while plaintiff was a member of the Eeserve, the Army established the Organized Eeserve Corps Service Evaluation Program which was designed to determine the mobilization potential of the Eeserve. Due to plaintiff’s long history of respiratory ailments, it was determined that plaintiff was not physically qualified for retention in the Eeserve.
On July 5,1951, plaintiff was advised that “As a result of the OEC Evaluation Program * * *” he had been found disqualified for “* * * retention in the Active or Inactive Eeserve by reason of physical disqualifications.” Plaintiff was then placed in the Honorary Eeserve.
During the next two years, plaintiff sought to secure either disability retirement pay or reinstatement. He was finally advised by the Adjutant General that the Army Board for Correction of Military Eecords offered him his only possibility of recourse. Plaintiff did apply to the Army Board for Correction of Military Eecords. His first application, filed on August 12,1953, was denied without hearing on September 8,1954, on grounds that no error or injustice was revealed in plaintiff’s record, thus tacitly affirming the correctness of the Army Eetiring Board’s earlier determination that plaintiff was not disabled. The application was resubmitted, requesting explanation of the denial on February 5, 1955. The reply, dated February 21, 1955, reaffirmed the fact that plaintiff was “not physically unfit to perform the duties of your office, grade or rank at the time of your relief from active duty.”
Plaintiff then sought relief here. His petition was filed on June 3,1960. We are now called on to determine whether the Correction Board’s action in denying plaintiff a hearing and correction of his record was arbitrary, capricious, unsupported by substantial evidence, or erroneous as a matter of law.
*313 It is clear and well established that the approved findings of the Army Betiring Board constituted a “final determination” of plaintiff’s right to disability retirement pay at the time of his release from active duty in 1947, and since suit here was not filed within sis years, we are barred by the statute of limitations from reviewing the correctness of that final determination. Friedman v. United States, 159 Ct. Cl. 1, 310 F. 2d 381, cert. denied 373 U.S. 932.
Further, nothing in the record indicates that plaintiff should have been granted physical disability retirement at the end of his second tour of duty (1948-1950). He was neither ill nor hospitalized during that time. He was released from this tour “not by reason of physical disability.”
In view of this record of good health during the second tour of duty, we can find nothing that indicates the action taken by the Correction Board was arbitrary, capricious or unsupported by substantial evidence. Bather, we accept the reasoning of the Board as expressed in a letter to plaintiff dated February 21,1955, which reads in pertinent part:
The administrative procedures established by the Secretary of the Army for the guidance of the Army Board for Correction of Military Becords provide that an application for a hearing by the Board may be denied where a sufficient basis for review has not been established.
An examination of your pertinent Army records disclosed that you were relieved from active duty 12 October 1947 not by reason of physical disability. You were recalled to extended active duty 22 October 1948 and following a physical examination on 28 October 1948 you were considered to be physically qualified for general service. On 15 March 1950' you were found physically qualified and your relief from active duty on 29 March 1950 was not by reason of physical disability. A review of your case by the Surgeon General’s Office on 2 October 1952 resulted in the finding that you had insufficient physical disability on 15 March 1950 to have warranted your appearance before a Physical Evaluation Board. Your records were again reviewed by the Surgeon General’s Office on 15 June 1954 at which time it was stated that you were not eligible for physical disability retirement on 29 March 1950. The fact that more than a year after your relief from active duty you were found tojbe physically disqualified for retention in the active or in *314 active reserve has no bearing upon your request for retirement by reason of physical disability.
Following your visit to this office your records were referred to the Army Physical Keview Council for review and on 31 August 1954 that office reported that you did not have a ratable disability on 29 March 1950. In consideration of the foregoing it was concluded that you were not eligible for retirement by reason of physical disability since you were not physically unfit to perform the duties of your office, grade or rank at the time of your relief from active duty. Because justification for a formal hearing and review of your case by the Board had not been established, your application was denied.
A later letter of explanation written by the Correction Board dated December 6, 1955, further explained:
As concerns Major Ferguson’s having been found physically disqualified for retention in the active or inactive reserve and transferred to the honorary reserve in 1951, the Board states that such action was not inconsistent with the finding that he was physically qualified for retention on active duty in 1950. In this respect, the application of physical standards in determining whether an officer is physically qualified for retention in the active or inactive reserve and for entry on active duty is necessarily more rigid than in applying the standards as regards retention or separation of officers already on active duty.
Consequently, since we are now called on only to review the decision of the Correction Board and its action in denying plaintiff a hearing on the question of his physical condition at the time of his release from his second tour of active duty, we cannot say, upon the record as a whole, that the Correction Board’s decision was arbitrary, capricious, unsupported by substantial evidence, or erroneous as a matter of law. Nothing we say herein determines any claim or cause of action plaintiff may have on account of his discharge from the active or inactive reserve in July 1951 (Findings 33-34). In quoting from the view of the Correction Board on the propriety of the discharge, the court does not *315 intend in any way to pass upon the legality of the discharge. The petition is therefore dismissed as to plaintiff’s claim for disability retirement pay.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner C. Murray Bernhardt, and the briefs and argument of counsel, makes findings of fact as follows:
1. Service History. On June 6, 1936, plaintiff was appointed a Second Lieutenant, Field Artillery, Officers Reserve Corps and, after successive promotions, attained the rank of Major in the military service on January 18, 1945. After short training tours in 1936, 1938 and 1939, he served on active duty from August 1, 1940 to October 12, 1947; from October 22, 1948 to March 29, 1950, and from June 18 to June 30,1951.
2. Physical examinations; 191ft. Plaintiff’s physical examination for entrance on extended active duty, dated June 21 and August 3,1940, reported that he was not permanently incapacitated for active service. No significant medical history is disclosed in the Reports of Physical Examinations, other than minor conditions not relevant to the issues in this case. Among other items, the reports state that plaintiff’s nose and throat were normal.
3. Stateside medical history; 1940-43. On August 1,1940, plaintiff commenced an extended tour at Fort Lewis, Washington. He was assigned to a Pack Artillery Battalion, lived in a tent, and served under very damp and muddy conditions. In December 1940 he was treated for four days at the Fort Lewis Station Hospital for an acute catarrhal, moderately severe, nasal pharyngitis, and was discharged with a final diagnosis of pharyngitis. In July 1941 while performing duties with his firing battery, he complained of severe nose congestion, running nose, watering eyes, severe frontal headaches, difficulty in breathing, nausea and feeling of faintness. Because he was under orders to proceed to Camp Carson, the Station Hospital allergist felt there was *316 insufficient time to treat him. The Camp Carson Dispensary diagnosed his case as hay fever,' on August 13,1942, and, for want of facilities at the Station Hospital, he was sent to Fitzsimons General Hospital for treatment. In several outpatient visits at Fitzsimons, he was tested for allergy, but not given any treatment. He was told nothing could be done for him. His headaches persisted. In November 1943 he was sent overseas. Plaintiff’s medical expert rendered the opinion that, having developed this condition as a mature male, plaintiff should have been given a more thorough examination, X-rays and treatment to arrive at a definitive diagnosis before having been ordered overseas.
4. Calcutta, India; winter 1944. Plaintiff was sent to India via North Africa, Suez and the Ned Sea. His symptoms intensified when his boat entered the Ned Sea in January 1944. In February and March 1944 he was given outpatient treatment for his nose and chest at the 112th Station Hospital in Calcutta, then experiencing sneezing, itching of nose and eyes, wheezing and shortness of breath for which, he was told, nothing could be done.
5. Burma; April 1944. From India, plaintiff was sent to the Burmese front with a Pack Artillery Battery. There he was stationed in a humid jungle. His quarters were in a dugout. On the second night, an attack of asthma brought him out of Ms sleep. For several hours he wheezed, could not breathe in and out, felt great pressure on his chest and choked, as if someone held his throat. The attack recurred each night for two weeks, at the end of which he had lost so much weight and felt so ill that on April 27,1944, he consulted the medical officer at a 38th Division medical facility where his condition was diagnosed as asthma, hay fever, sinusitis. He was sent to the 20th General Hospital, CBI Theater.
6. 20th General Hospital, CBI; May 1944.
(a) Plaintiff was a patient at the 20th General Hospital from April 28 to May 29, 1944. He was admitted for hay fever and asthma. At the time of his admission the following history of Ms illness was recorded:
This pt. had hay-fever for two spring seasons when he was 13 & 14 yrs. old. Was then well until about 3 yrs. *317 ago when he began having hay-fever again. First knew he wheezed in his chest about two years ago. This never caused him to lose time from duty until he arrived in India.
Began having more trouble when his boat entered the Eed Sea, Jan. ’44. Had treatment for nose & chest 112 Sta. Hosp. Calcutta — sneezing, itching of nose and eyes, wheezing & shortness of breath from 19 Feb to 12 Mar approx. Same trouble in Eangoon from 12 Mar to 1 Apr.
Has for past two weeks been on the Burma front — his condition there has been much worse than ever before. Hasn’t been able to carry on with it.
Coughs and has good deal sputum. Nervous 3+past 2-3 years. Poor appetite — nausea at times. Sleeps 1+poorly. Nocturia IX — 2yrs.
An ear, nose, and throat examination, dated May 3, 1944, stated as follows:
Eeexamination shows no evidence of pus in the nose but only watery discharge. There are no polyps in the nose. Believe the mucous membrane thickening in the sinuses is part of the allergic process and not due to infection. The suggestive X-ray signs of polyp in the right antrum could well be a mucous polyp and also part of the same process.
(b) During his stay in the 20th General Hospital the plaintiff suffered on several occasions from wheezing and dyspnea (difficulty of breathing) which kept him awake several hours during the nights. He complained there of discomfort in the chest. Musical rales were found in plaintiff’s chest on exploration. Eales are defined as a hissing noise, detected by stethescope, due to constriction of the bronchial tubá, with excessive mucous, a symptom of asthmatic attack. Wheezing and dyspnea, coupled with cough and expectorations and nocturnal attacks, are symptoms of asthma. Plaintiff was given ephedrine and amytol for his wheezing.
(c) A sinus X-ray showed bilateral membrane thickening of the frontal sinuses; slight bilateral membrane thickening of the ethmoid; marked thickening of the right maxillary with suggestion of polyp in the right antrum. The frontal sinuses are air-containing spaces located in the forehead and the maxillary in the cheekbones. The ethmoid is in the *318 ethmoid bone which, forms a roof for the nasal fossae and part of the floor of the anterior fossa of the shall (Dorland, Medical Dictionary, 22nd Edition). The thickening membranes and polyp were thought to be due to an allergy process rather than infection. The X-ray showed sinusitis, a diagnosis repeatedly made in subsequent hospitalizations, confirmed by plaintiff’s symptoms and the suggestion of polyp, an outgrowth of the mucous membrane in the nose and sinuses, produced by allergy.
(d) The diagnosis made at the 20th General Hospital was a moderately severe, perennial, allergic rhinitis, sufficient to cause a great deal of discomfort, and frequent bronchitis. The final diagnosis recorded was moderately severe, vasomotor, allergic rhinitis, cause undetermined, EPTAD (existed prior to active duty).
7. 25th Field Hospital, Burma; May 1945. Plaintiff’s symptoms continued, with periodic asthmatic attacks which seemed to depend on the locality where he was stationed. In April 1945, after suffering severe headaches for two weeks, his medical officer sent him to the 25th Field Hospital at Lashio, Burma, where he remained from May 2 to May 6, 1945, when he was transferred to the 18th General Hospital with a diagnosis, based on X-ray, of acute sinusitis, left front maxillary.
8. 18th General Hospital; May-June 1945 — First Disposition Board.
(a) At the 18th General Hospital, where plaintiff was treated from May 6 to June 13, 1945, a diagnosis of severe sinusitis, frontal and maxillary, chronic, suppurative, left, etiology unknown, was made, upon the basis of a physical examination which contained plaintiff’s statement of intermittent headaches for three-four years and showed a considerable swelling around his left eye; an ENT consultation and an X-ray on May 17,1945, which indicated clouding of the right maxillary sinus, and the left frontal and posterior ethmoid cells, with thickening membrane of left maxillary sinus. The remaining sinuses were clear. Treatment having failed to improve his condition, it was recommended that he be transferred to the Zone of the Interior.
*319 (b) On May 24, 1945, a Disposition Board at the 18th General Hospital found that plaintiff had severe, chronic sinusitis, suppurative, frontal and maxillary, etiology unknown, line of duty; a marked hypertrophy and edema of the mucous membranes of the nose, especially on the left, with complete obstruction on the left; tenderness over the left maxillary and frontal sinuses with swelling of tissues about the left eye. The Board stated that while the acute phase had cleared up, the hypertrophy and edema had not subsided, and with plaintiff’s history of constant obstruction of the nose, frequent headaches and physical findings, he should be transferred to the continental United States. The Board found that plaintiff was physically disqualified for the performance of further duty in “this” theater.
9. Evacuation to United States; August 1915. Plaintiff was evacuated through the 142nd General Hospital and transferred to the United States via water on August 5,1945, with the diagnosis of severe frontal and maxillary sinusitis. On September 3 he was admitted to Halloran General Hospital, Staten Island, New York, and transferred to DeWitt General Hospital, Auburn, California, on September 8, 1945.
10. DeWitt General Hospital; September-December 1915.
(a) Plaintiff was a patient at DeWitt from September 12 to December 3, 1945, where he had a thorough checkup, including physical examinations; consultations with a heart specialist; neurologist; ENT consultant; allergist; skin tests; dental examinations; physiotherapy; X-rays of sinuses and lungs, and laboratory reports.
(b) The final diagnoses made after this extended examination, observation and testing, were:
1. Rhinitis, chronic, allergic, moderately severe, cause undetermined. Improved.
2. Sinusitis, maxillary, bilateral, chronic, cause secondary to (1), moderately severe. Improved.
3. Sinusitis, post-ethmoids, bilateral, chronic, cause secondary to (1). Moderately severe. Improved.
4. Sinusitis, frontal, chronic, suppurative, left severe, etiology undetermined.
5. Asthma, chronic, bronchial, cause undetermined, moderate. Improved.
*320 6. Nasal septum, deviation of, left, 60% obstructive; cause unknown. Unimproved.
It was found that items 1 through 5 were incurred in line of duty, and that item 6 existed prior to active duty.
(c) The foregoing diagnoses were made on the basis of the facts presented in the following clinical abstract, which also recommended that plaintiff be placed on permanent limited duty confined to the continental United States:
Major Ferguson started having a “stopped up nose” with sneezing and discharge about four years ago when stationed in Ft. Lewis, Washington, after being there about 6 months. Had symptoms of “hay fever.” Eyes were irritated with lacrymation. Bright sunlight and heat seemed to make it worse. There was also a sensation of nauses, aggravated if he ate. heartily and associated feeling of faintness. During this time he had severe headaches. This occurred during June and July 1941. Symptoms have persisted with more or less severity ever since. As a child, he did develop sneezing and itching of the eyes with lacrymation when around cottonwood pollen, had about two years and then stopped. Went to Fitzsimons as outpatient in fall of 1942 and skin tested; found no sensitivity to “anything they had.” No treatment. In September 1943, started noting palpation of heart; felt as if it would burst — this occurred any time and lasted 2 to 3 minutes. Has occurred off and on ever since. In April 1944 in Burma, started having wheezing at night; couldn’t breathe lying down, had to sit or stand up. Nose about same. Fias continued intermittently ever since. Has had several attacks of minor trouble here.
Developed pain in both shoulders in February 1944 in Calcutta. Treated at 112th General Hospital, Calcutta with heat and massage. Diagnosis of neuritis. Left shoulders and shifted to hands 6 months ago in India and is worse in hands now, although is intermittent. Was in the 20th General Hospital in Ledo, Assans, India from 29 April 1944 to 29 May 1944. Had headache, stuffy nose, and wheezing in lungs. Was given nose drops for sinusitis. X-rayed sinuses. Also amytol-ephedrin pills for wheezing.
At DeWitt, he has had some “wheezing” and an intermittently blocked nose. Occasional pus in nose. Examination of nose disclosed engorged pale turbinates with excess mucous all areas. Smears show eosinophilia, *321 proving diagnosis of allergic rhinitis, although was not sensitive to anything except dust on skin tests. X-rays of sinuses show maxillarys and ethmoids to be cloudy. Allergic consultation gave a diagnosis of chronic asthma. Neurology gave clearance for suspected neuritis as did medicine on palpation of the heart.
It is felt maximum hospitalization has been obtained. In view of his having a chronic allergic rhinitis; chronic asthma; and a chronic sinusitis, it is felt that officer should be placed on permanent limited duty confined to the continental United States.

11. Bushnell General Hospital; December 19J/S.

(a) Plaintiff was transferred to Bushnell General Hospital, Brigham City, Utah, and was there from December 13 to December 22, 1945. He was examined there by an allergist and an ENT consultant, it being recorded that he had received adequate studies at DeWitt General Hospital, whose records were reviewed and accepted. The allergist reported as follows:
This patient described recurrent attacks of marked dyspnea with wheezing respirations while on duty in Burma. He said there was considerable dust in the air at the time. He also noticed that a change of locality only ten miles away made his symptoms completely disappear. Since returning to the States he has noticed a few mild attacks of wheezing respiration. Recently there have been none. He had allergic workup at De-Witt GH which showed a 3 plus reaction to dust with other tests negative. He has seven percent eosinophilia in differential blood smear and 32 percent eosinophilia in nasal smear. On perusal of his previous records from DeWitt and overseas there is no statement of the patient having been observed in an attack of asthma.
On examination today the lungs are entirely clear.
Discussion: This patient probably did have a situational asthma while in Burma from which he now has recovered. I see no objection to his return to permanent limited duty.
(b) The final diagnoses at Bushnell General Hospital were:
1. Rhinitis, chronic, allergic, moderate.
2. Sinusitis, chronic, non-suppurative, maxillary and ethmoid, bilateral, moderate.
*322 12. Second Disposition Board; December 1945. A Disposition Board, convened at Bushnell General Hospital on December 20,1945, found tbe plaintiff to have the following diagnosis: “Allergic state, manifested by rhinitis, sinusitis and bronchitis. Condition unchanged. LD No, but permanently aggravated by military service.” The Board further found that plaintiff was not qualified for overseas, and recommended that plaintiff be returned to duty for permanent limited service. The Board stated the disability briefly in nontechnical language as “Stuffy nose, sinus trouble and cough.” Plaintiff, under date of December 20, 1945, certified that he desired to remain on active duty in a permanent limited service status. Plaintiff was discharged from the hospital on December 22,1945.
13. Fort Sam Houston, Texas; February 1946. Plaintiff was sent to the Redistribution Center at Fort Sam ITouston, San Antonio, for reassignment. There, in February 1946, he experienced severe asthmatic attacks, with wheezing and difficulty in breathing, for about 13 nights.
14. Fort Sam Houston, Texas; February 1946. On February 12,1946, plaintiff was given a Special Physical Examination at Fort Sam Houston, Texas, and found to be not permanently incapacitated for limited service. It was reported that plaintiff had allergic sinusitis and rhinitis, moderate.
15. Fort Sill, Oklahoma; February-April 1946. From Fort Sam Houston, plaintiff was assigned to Fort Sill, where he remained for two months. For a short time there the asthmatic attacks continued. In approximately April 1946 plaintiff was ordered to Camp Campbell, Kentucky.
16. Camp Campbell, Kentucky; April-October 1946. Beginning July 1, 1946, plaintiff suffered very severe attacks at Camp Campbell, at times starting in the afternoon and extending to the next morning, occasionally beginning during the night and lasting one to several hours. These attacks continued to September 12,1946, when plaintiff was admitted to the Station Hospital on an out-patient basis with a diagnosis of “allergic state manifested by rhinitis, sinusitis and bronchitis, LD: No. Now having moderate asthmatic at *323 tack.” It was found that the expiratory phase of respiration was prolonged and accompanied by wheezes. Large nasal polyps were believed to have been discovered and surgery considered, but these were found to be inferior turbinates markedly enlarged with a septum deviation of 40 percent left. A diagnosis of mild bronchial asthma was entered and ephedrine sulfate, phenobaritol and benadryl were prescribed for it.
17. Camp Campbell, Kentucky; April-October 1946. Plaintiff suffered an additional attack in Kansas while on leave from Camp Campbell, and complained of nausea and severe pains in his head, sinuses and lungs. Following this attack plaintiff was again admitted to the Camp Campbell Station Hospital for observation for bronchial asthma. The clinical record discloses statements of the plaintiff in the history he gave the hospital on his admission that, since returning to the United States, he had experienced the same attacks of nocturnal asthma in all the places where he had been stationed or assigned in the United States, and that he had no allergic manifestations of which he was aware. The impression of the plaintiff’s condition at the time of his admission, as reported in the clinical record, was “Bronchial Asthma — only on history.” An X-ray of his sinuses at Camp Campbell showed a markedly clouded right antrum, while other sinuses were normal.
18. Wakeman General Hospital, Indiana; October-December 1946.
(a) On October 16, 1946, plaintiff was transferred to Wakeman General Hospital at Camp Atterbury, Indiana, for further observation and treatment, final evaluation and disposition before separation from the Army. His transfer diagnosis was history of moderate perennial bronchial asthma, and chronic, allergic, perennial rhinitis.
(b) Examinations on admission to the hospital disclosed expiratory wheezes on forced expiration; slight hy-perresonance over both lungs and rales on deep respiration and expiration, especially at the end of respiration, numerous sibilant and sonorous rales; rare wheezes at left base on deep *324 respiration and on three occasions, rare “bronchi” at lung base on very deep respiration.
(c) Hyperresonance means the existence of too much air in the lungs, more air going in than out, so that on tapping, the sound is similar to that of the tapping of a ripe melon. It is produced by forms of asthma.
(d) X-rays of the sinuses showed moderate clouding of the right antrum but remaining sinuses clear; moderate thickened membrane of right antrum (cavity or chamber, especially within a bone), slight thickening of left antrum and left ethmoid; thickened membranes in both antra, more marked on right. Esonophile tests of nasal mucous ranged from zero percent to 80 percent.
(e) Plaintiff’s history indicated, among other things: a thick yellow nasal discharge at Fort Lewis in 1941; after his return from overseas he experienced severe coughing, at times, followed by abdominal and chest soreness.
(f) Plaintiff reported a severe nocturnal attack, lasting five hours, on November 2, 1946, while on a weekend pass and perhaps a second attack away from the hospital the previous month. With the exception of hyperresonance, wheezing and rales, supra, he experienced no attacks while at the hospital. He did, however, suffer a severe, constitutional reaction consisting of asthma, plus hives or urticaria due to a dose of dust antigen administered on December 8, 1946.
(g) The consulting allergist made a diagnosis of moderate, bronchial asthma, from history, and moderate, allergic rhinitis due to multiple sensitivities, which diagnoses were incorporated in the hospital Final Summary. Plaintiff was recommended to appear before a Medical Disposition Board.
19. Third Disposition Board; November 1946. A Disposition Board met on November 8,1946 to consider plaintiff’s case, but it was felt that further information regarding the asthma diagnosis should be obtained. At the time there apparently were no Camp Campbell records on plaintiff at Wakeman. On November 22, a copy of a Camp Campbell Clinic Record dated September 13, 1946, was received and showed mild bronchial asthma present though no physical *325 findings were recorded. The September 12, 1946 Camp Campbell record containing the entry “Now having moderate asthmatic, attack” (finding 16, supra) is not mentioned and is not referred to in any of the Wakeman records or board proceedings.
20. Reconvened Disposition Board; November 1946.
(a) A Disposition Board, reconvened on November 22, 1946, found that plaintiff had the following diagnoses:
1. Rhinitis, chronic, allergic, perennial, due to sensitivity to dust, feathers and ragweed. LD: Yes. Condition upon completion of case: Unchanged.
2. Asthma, bronchial, chronic, perennial, mild, cause undetermined. LD: Yes. Condition upon completion of case: Unchanged.
The Disposition Board found that the causes of the incapacities were not incident to service; existed prior to entry on active duty; were not permanently aggravated by active duty; and that the degree of disability for military service was partial and temporary. The Board further found that plaintiff was not qualified for overseas and recommended temporary limited service; and that plaintiff be ordered to appear before an Army Retiring Board.
(b) The Clinical Abstract, attached to the Disposition Board Proceedings, stated as follows:
This 35-year old Major, FA, entered active duty in a commissioned status on 1 August 1940. He had previous service in the ORC from June 1936 to July 1940. He served in the CBI Theater from February 1944 to August 1945. The officer entered the Army on a general service status but is at present permanent limited duty by action of an Army Retiring Board at Bushnell General Hospital on 20 December 1945. He is in Category III, is eligible for separation and desires to be separated.
PAST HISTORY: Non-contributory.
PRESENT ILLNESS: The officer was in good health until the winter of 1941-42. He had no history of eczema as a child. He has had only two episodes of urticaria during his life. At the age of 11 or 12 during three years, in September, he had some nasal stuffiness, sneezing and lacramation which was believed due to the seeding of cottonwood trees. In the winter of 1941-42 he *326 was stationed at Fort Lewis, Washington and was exposed a great deal to cold damp weather. He began to have a persistent rhinitis accompanied by a frequent frontal headache. He also had light headed sensations, much sneezing and a thick yellow nasal discharge. There was also excessive lacramation of the eyes but little if any cough. These symptoms continued through the two years the officer was at this station. Fie was told that he had allergic rhinitis but no special _ therapy was taken. Following this the officer was stationed in Colorado but the symptoms continued. He was studied at Fitzsimons General Hospital as an outpatient where he was treated for allergy but unsuccessfully. The officer continued to have his symptoms in North Africa and in India. In April 1944 while in the Burma jungle at his station one night he was awakened from sleep by shortness of breath and difficult inspiration and expiration. The symptoms continued each night for two weeks and were accompanied by audible wheezing. There were no symptoms in the day time. The officer was returned to the 20th General Hospital in India where he was given some symptomatic treatment but since he was free of symptoms in the daytime little consideration was given to his history. He therefore voluntarily returned to his unit. During the following Sy2 months in combat he had only one more such nocturnal episode. He had a few other less severe nightly episodes. Later in 1945 his rhinitis continued to bother him and finally he had a severe episode of sinusitis. He was hospitalized at the 18th General Hospital and evacuated to the Zone of Interior in September 1945. He was hospitalized at De-Witt General Hospital where he was found to be sensitive to house dust. On 7 December 1945 he was transferred to Buslmell General Hospital and on 20 December 1945 he met an Army Betiring Board which placed him on permanent limited duty because of rhinitis and sinusitis. No asthmatic episodes were observed during these hospitalizations. The officer was then stationed at Camp Campbell, Kentucky, and continued to have nightly asthmatic attacks. Occasionally these occurred in the daytime. He had had no specific therapy but thought that smoking a cool cigarette relieved him. At times severe coughing accompanied the attacks. On 2 October 1946 folowing an asthmatic attack he entered Camp Campbell, Kentucky and was transferred to this hospital for final disposition.
PHYSICAL EXAMINATION: Beveals a well developed, fairly well nourished officer in no acute distress. *327 There is slight hyperresonance over both lungs. Upon deep inspiration and expiration there are numerous sibilant and sonorous rales over both lung fields.
LABORATORY FINDINGS: Urinalyses and Kahn negative. Complete blood count normal with 3 % eosion-philes. Nasal smear shows 20% eosinophiles.. Sputum smear shows no eosinophiles. Three malarial. smears and three stools were negative. Vital capacity is 117% of normal. X-ray of chest is clear. X-ray of sinuses shows moderate clouding of right antrum.
COURSE IN HOSPITAL: The officer was ambulatory but continued to have chronic rhinitis throughout his stay. He had only one asthmatic attack which occurred while on pass. He was seen by the ENT consultant who noted clouding of the right antrum. This was irrigated but no purulent material was obtained. He was cleared by the consultant. The officer was seen by the allergy consultant who, by skin tests, noted sensitivity to dust, feathers and ragweeds. The officer was given a two-week course of dust desensitization to which he had rather violent reactions but no improvement. The officer had only one asthmatic attack during his stay and this occurred while away on pass. It was felt that maximum hospital benefit had been attained.
RECOMMENDATION: That officer appear before a Medical Disposition Board.
21. Submissions to Army Retiring Board; December 19J¡j6.
(a) In the report of plaintiff’s medical history and physical examination, dated December 11,1946, and filed with the Betiring Board, certain items of the plaintiff’s history, symp-tomatology and findings recorded at Wakeman were omitted or modified.
(b) Omitted entirely were the Camp Campbell transfer diagnosis of moderate bronchial asthma, history of; the Camp Campbell entry, “Now having a moderate asthmatic attack,” and the finding of prolonged expiration accompanied by wheezes (findings 16, 17, supra).
(c) Omitted are the Wakeman allergy specialist’s diagnosis of moderate bronchial asthma, from history (finding 18, supra); the diagnosis of asthma, bronchial, mild, of the November 22 Disposition Board (finding 20, supra). The phrase “rather violent reactions to the dust antigen,” appearing in the Disposition Board proceedings (finding 20, supra), *328 was changed to “several reactions.” While plaintiff’s statement that he experienced an asthmatic attack away from the hospital is referred to, it is erroneously reported that plaintiff said the attack lasted one-half hour, whereas he had given the time as five hours (finding 18, supra).
(d) As to the sinusitis and rhinitis conditions the X-ray findings at Wakeman of thickened membrane of the right and left antrum, and of moderate thickened membrane, right an-trum, slight thickened left antrum and left ethmoid, and thickened membranes in both antra, more marked on right (finding 18, supra), are omitted.
(e) The Wakeman allergist’s diagnosis of moderate, allergic rhinitis (finding 18, supra) is changed to “mild,” and the statement in the November 22 Disposition Board’s proceedings (finding 20, supra) that plaintiff had chronic rhinitis throughout his stay at Wakeman, is omitted.
22. Testimony before Army Retiring Board; December 1946. Plaintiff was given a retirement physical examination at Wakeman General Hospital on December 11, 1946, and appeared before an Army Retiring Board, convened on December 12, 1946. The membership of the Retiring Board consisted of five officers, two of whom were from the Medical Corps. The two medical witnesses who testified before the Board were the same two doctors who had physically examined plaintiff on December 11,1946. One of them had previously given the plaintiff an ear, nose, and throat examination on October 11, 1946. One of the medical witnesses had graduated from medical school in September 1944 and had interned nine months when he entered the Army in July 1946. The other medical witness graduated from medical school in August 1943 and prior to his testimony had nine months internship, 18 months residency, and three months at Wakeman. The testimony of the two medical witnesses before the Board was brief and confirmed their report. Neither mentioned asthma in connection with plaintiff. In his testimony before the Board the plaintiff stated that he had sinusitis and rhinitis, and that “I did have asthma, but I have no clinical record of it.” He stated that he desired to be relieved from active duty, that he desired to remain in a *329 patient status until the completion of action in his case, and did not desire personal counsel.
23. Findings of Army Retiring Board; December 1946. The Army Eetiring Board found that plaintiff was not permanently incapacitated for active general service, and recommended general service. The Surgeon General, by action dated December 26,1946, concurred in the findings and added that plaintiff was physically qualified for general military service. This action was approved by the Secretary of War on January 7,1947.
24. Percy Jones and Madigan Hospitals; January-July 1947.
(a) Due to the deactivation of Wakeman, plaintiff was sent to Percy Jones Hospital at Battle Creek, Michigan, and, at his request, he was transferred from there to Madigan General Hospital at Tacoma, Washington, “awaiting word from Washington on the findings of the Army Eetiring Board”. Plaintiff remained at Percy Jones from January 5 to January 16, 1947, and at Madigan from January 23 to July 26,1947.
(b) Plaintiff was admitted to Madigan General Hospital with diagnoses of mild bronchial asthma, and moderate sinusitis and rhinitis. The Final Summary of his hospitalization at Madigan stated in part as follows:
* * * Since arriving at Fort Lewis he has had occasional slight attacks of asthma and mild episodes of hayf ever and sinus trouble.
PHYSICAL EXAMINATION: Physical examination upon admission revealed a well nourished white male who showed a moderate injection of the nasal pharynx suggestive of an allergic rhinitis. The lungs revealed some asthmatic wheezing of minimal nature. Otherwise the physical examination was within normal limits.
LABORATORY EXAMINATION: Laboratory examination revealed white count of 7,300 a hematocrit of 46, a 5 % eosinphila count. Urinalysis within normal limits, examination for smear and culture was negative. He was seen at the Dermatology clinic where the diagnosis of bronchial asthma was made, and a period of desensitization shots were initiated. He was seen at the ENT clinic where a diagnosis of allergic rhinitis was made *330 and medications were advocated. He received Dental Clearance. X-Bay’s of tbe heart and lungs were reported within normal limits.
00 URSE WHILE IN THE HOSPITAL: The patient has had no severe episodes of asthma while in the hospital. He has had minimal episodes only. He has had subdegree of sinusitis for which he has received therapy. In view of the fact he has met an AEB and is awaiting orders to return to duty, the patient will be returned to duty with the diagnosis of 1. Bronchial asthma, mild. 2. Sinusitis, allergic, moderate. 3. Allergic rhinitis, moderate.
DIAGNOSIS: 1. Bronchial asthma, mild.
2. Sinusitis, allergic, moderate.
3. Allergic rhinitis, moderate.
LOD: 1 and 2 Yes: 3 No EPTS.
DISPOSITION: Eeturn to duty upon receiving orders from Washington, D.C.
(c) The Madigan record contains findings of hyper-resonance and occasional asthmatic wheezes, occasional “slight attacks of asthma”, and diagnosis of asthma by the Allergy Clinic, with the suggestion that plaintiff be removed as far as possible from house dust.
(d) Plaintiff was given extensive treatment at the Allergy Clinic in which his history subjectively recorded about three dozen attacks of asthma, some severe, some mild, since April 1944, attacks occurring at any place, in any season, with wheezing and dyspnea.
(e) On July 26,1947, plaintiff was released from Madigan and returned to “Duty, General Service.”
25. Separation; October 1947. Plaintiff was sent to the Fort Lewis Separation Center, where he had a terminal examination on July 28,1947. In the medical history (Items 12 and 52) it is stated that plaintiff was hospitalized with asthma sinusitis in Burma and India, 1945, but no reference is made to subsequent hospitalizations for these conditions nor to the contemporary diagnoses of asthma at Madigan. On July 29, he was ordered on terminal leave and was released from active duty not by reason of physical disability on October 12,1947.
*331 26. Veterans Administration pension; May 1948. Plaintiff filed an application with Veterans Administration for pension or compensation benefits. The undated application, which was received by Veterans Administration on November 7,1947, stated the nature of the disease or injury to be sinus and allergic rhinitis, asthma, and fillings in teeth. The Veterans Administration’s Report of Physical Examination, dated May 18, 1948, stated, in part, as follows:
16. Respiratory system: Normal? * * *
History of onset of asthma April 1944 in Burma. Wheezing, difficulty breathing nocturnally. Since separation and return to Boise admits he has had only infrequent mild episodes.
Examination reveals no evidence of pulmonary disease. Breath and voice sounds are clear throughout. There is no prolongation of either respiratory phase.
Based on its physical examination of May 18,1948, plaintiff was rated by Veterans Administration on July 9,1948, at 10 percent from October 13, 1947, for asthma, bronchial, and zero percent from October 13,1947, for sinusitis, maxillary.
27. Physical examination; September 1948. Plaintiff was examined on September 14,1948, at USAF Station Hospital, Hill Air Force Base, Hill Field, Utah, for extended active duty. The report of physical examination discloses, in part, as follows:
12. MEDICAL HISTORY: Tonsillectomy 1928, appendectomy 1943, circumcision 1945, gunshot wound in left arm just above the elbow, no complications. Scars on face, multiple, right ear cut off sewn on, and right 6th rib broken, from auto accident during Terminal Leave 1947, no complications. Denies all else.
H» %
36. RESPIRATORY SYSTEM: Normal.
37. OHEST X-RAY: #18635 Heart and lungs normal.
5jí i'fi
53. CORRECTIVE MEASURES OR OTHER ACTION RECOMMENDED: Recommend waiver for hearing loss in high frequencies, * * *.
54. IS INDIVIDEAL PERMANENTLY INCAPACITATED FOR GENERAL SERVICE? No.
*332 58. ACCORDING TO EXAMINEE'S STATEMENT IS (S)HE DRAWING A PENSION, DISABILITY ALLOWANCE, OR OTHER COMPENSATION OR RETIRED PAY FROM THE Ü.S. GOVERNMENT? No.
28. Reentry on active duty; 1948-1950. Plaintiff entered on extended active duty on October 22,1948, and underwent an “Interval” Physical Examination for active duty. This Physical Examination was conducted at Fort Lewis, Washington, on October 28,1948. The “Medical History” portion of the Report of Physical Examination noted “No essential deviation from initial physical”, and plaintiff denied drawing a pension, disability allowance, or other compensation or retired pay from the TJ.S. Government. Nose and throat were recorded as normal. He was again found not permanently incapacitated for general service, and appointment was recommended. Plaintiff was then serving on active duty as a Major, Field Artillery, Officers’ Reserve Corps. Plaintiff’s purpose in reentering on active duty was to accumulate longevity required for retirement under Public Law 810 enacted in 1948, which accorded longevity retirement to non-Regular officers. Plaintiff served on active duty from October 22, 1948 to March 29, 1950, when he was released from active duty, not by reason of physical disability in accordance with Section 515(d) of the Officer Personnel Act of 1947, 61 Stat. 795, 907.
29. Release from active duty; March 1950. Plaintiff’s physical examination for relief from active duty, dated March 15, 1950, reported that the “officer denies history of asthma, hay fever, * * [1] The examinations of the nose, sinuses, mouth and throat, lungs and chest, and the chest X-ray, were all reported as N.S.A., representing “No Significant Abnormality.” Plaintiff was found medically qualified for relief from active duty.
30. Reserve Physical Evaluation Program of 1951.
(a) On March 18, 1951, the Department of the Army established an “Organized Reserve Corps Service Evalúa *333 tion Program,” which was stated therein to be “considered necessary to procure, evaluate, and maintain, up-to-date information on the reservist’s physical, occupational, personal affairs, dependency, and qualification status.” The ORC Service Evaluation Program included therein a physical evaluation plan, the purpose of which was “to determine those reservists not on extended active duty who are physically qualified to remain in the Active and Inactive Reserve, and to eliminate those who are physically disqualified.” The program of service evaluation was to be instituted on or about April 1,1951, and to be completed by July 31, 1951. All officers and enlisted members of the Active and Inactive Reserve not on active duty, who had not completed an acceptable Army physical examination subsequent to June 30,1950, were included within the scope of the physical evaluation plan. Physical examinations were to be final-type examinations. The physical standards to be used as a guide for retention of commissioned and warrant officers were contained in AR 40-105, titled, “Medical Department, Standards of Physical Examination for Commission or Warrant in Regular Army, National Guard of United States, Army of United States, and Organized Reserves.”
(b) The Physical Evaluation Plan of the ORC Service Evaluation Program further provided that the standards outlined in AR 40-105 should be liberally interpreted when evaluating physical fitness for retention in the Organized Reserve Corps, and that personnel may be found qualified for retention even though they have an illness or infirmity which would disqualify them for original appointment or enlistment, provided such diseases, injuries, or infirmities are:
(1) of such a nature and degree as not to preclude the satisfactory performance of military duty considering the individual’s age, grade, section, and anticipated duty assignment, and
(2) not subject to complications or serious aggravation if ordered into active military service, and
(3) not of a nature to preclude continental or oversea duty and with due consideration to the above-mentioned factors.
*334 The physical profile serial as set forth in AB 40-115 (ibid, p. 7, para. 7d), titled “Medical Department Physical Standards and Physical Profiling for Enlistment and Induction” was to be used as a guide in determining the physical classifications of officer personnel. Physical codes for use by the Medical Eeview Authority were as follows:

Physical code Physical status

Code 1 Physical classification A — Able to perform maximum sustained effort oyer extremely long periods.
Code 2 Physical classification B — Able to perform sustained effort over long periods.
Code 3 Physical classification C — Able to perform sustained effort for moderate periods.
Code 4R Physical defect remediable within one year..
Code 4 Physical classification E — Physically disqualified.
Personnel included in the physical classification C will include those with physical deviations which preclude their placement in physical classifications A or B, and in general constitute the group referred to under sub-paragraphs (1), (2), and (3), above.
Eeviewing authorities established by major commanders were to evaluate the completed Standard Forms 88 and 89, the forms used for the physical examinations.
31. Plaintiff’s Reevaluation Examination; April 1951. On April 5, 1951, plaintiff was examined pursuant to the reevaluation program. The report of physical examination contained the following entries:
19. Nose: External deformity of nose and deviation of septum and 50% obstruction on left.
H: ijs iji %
28. Limgs and Ohest: Lungs sound and clear. However patient gives a good history of recurrent attacks of asthma. X-ray film right to be checked for signs of emphysema. Patient states he is markedly allergic to house dust as tested at Madigan Hospital, Ft Lewis, Washington in 1947 from April to July.
Patient has report of Army Eetiring Board of Wake-man General Hospital at home.
Hi Hi % if: Hi
27. Ocular Motility: Slight lateral nystagmus.
Hi H< ifc % H*
31. Abdomen and Viscera: Bilateral relaxed inguinal rings.
*335 40. Shin, Lymphatics: Bullet wound (22 Cal.) left arm above elbow.
*****
73. Notes and Significant or Interval History: a. Usual childhood diseases, no sequelae. Eequires lens for correction of myopia. Has Hay-F ever periodically, but of mild degree.
States he had asthma of severe degree during year 1944 and 1945 while in India. Last severe attack in 1947. Mild attacks since palpitation associated with asthma only.
74. Summary of Defects and Diagnosis .(List diagnoses withitemnumbers)
28. History of bronchial asthma, verified by proceedings of Army Retirement Board at Wakeman General Hospital 22 November 1946.
19. Rhinitis, Chronic, seasonal.
The examiner found plaintiff qualified for extended active duty. The reviewing officer changed this finding to not qualified for extended active duty by reason of asthma with a Profile of A-l-1-1-2-1, and E type physical category, and physical code 4.
32. Plaintiff's tour of duty in 1951. Plaintiff served on active training duty from June 18, 1951 to June 30, 1951. Prior to entry on this tour of training duty, plaintiff signed a certificate wherein he stated as follows:
I now consider myself sound and well and physically qualified for full military duty. I was considered physically qualified for military service at the time of accomplishment of my last physical examination on or about April 1951 at Fort Douglas, Utah. To the best of my knowledge and belief, I have no physical defects or conditions, except as noted below [none were noted], which would preclude the performance of full military duty.
This duty was at Camp Williams, Utah, where plaintiff was assigned as a Food Service Supervisor under the command of a Colonel Turner.
33. Termination of tour of duty; July 1951. Although plaintiff had been ordered to duty at Camp Williams for a six-weeks period, after completion of two weeks duty his orders were revoked on July 2,1951, due to advice from the Medical Section of higher headquarters concerning plain *336 tiff’s “history of asthma beyond age of twelve disqualifying for active reserve”. His superior officer endeavored to intercede without success.
34. Transfer to Honorary Reserve; July 1951. On July 5, 1951, plaintiff was advised by the Utah Military District Headquarters that “As a result of the ORC Evaluation Program you have been found disqualified for retention in the Active or Inactive Reserve by reason of physical disqualifications.” On July 10,1951, plaintiff was advised that he was transferred from the active to the Honorary Reserve, relieved from his assignment to the 6214th Sta. Complement, Salt Lake City, Utah, and assigned to the 6295th ORASU, Utah ORC Ctrl. Gp. (Hon. Res.), effective July 14,1951.
35. Veterans Administration pension; 1953. On January 5, 1953, Veterans Administration awarded plaintiff a 10 percent rating for asthma, bronchial, from October 13, 1947. In addition thereto, plaintiff was assigned the following rating for sinusitis, maxillary, chronic: Zero percent from October 13,1947 to December 3,1952; and 10 percent from December 4, 1952. This resulted in a combined rating of 10 percent from October 13, 1947 to December 31,1952; and 20 percent from December 4, 1952. The rating sheet discloses that plaintiff was examined by Veterans Administration on December 4,1952. The Rating Board found as follows:
FACTS: Except for a faint expiratory wheeze, localized posteriorly just medial to the left scapula, the breath sounds are normal with no definite rales and no definite findings on expiratory cough. He has lost no time from work, but claims his asthmatic spells come on at night and he has difficulty breathing. The sinusitis condition is still present with moderate post nasal drainage and poor transillumination.
DISCUS8ION: These findings are essentially the same as on prior exam, so far as the asthma is concerned, but the sinusitis is now present to a compensable degree.
36. Efforts to obtain disability retirement; 1952-1953. During the years 1952-1953 plaintiff sought to secure disability retirement, or reinstatement, and was finally advised by the Adjutant General that the Army Board for Correction of Military Records was the “only agency known which *337 may have the authority to give further consideration to your case dependent upon your showing an error or injustice.”
37. Efforts to obtain disability retirement; 1952-1958. In 1952 plaintiff asked United States Senator Arthur V. Watkins of Utah to intercede in his behalf with the Army Surgeon General, stating in effect that he should have been retired in 1946-1947 for his World War II asthma, since the 1946 findings as to his condition had been the basis for declaring him physically disqualified in 1951. In September 1952 the Surgeon General expressed his opinion that in March 1950 plaintiff was found to “not have sufficient physical disability to warrant appearance before a physical evaluation board.” The plaintiff construes this to indicate that the Surgeon General considered only his March 1950 condition and not his World War II medical history of asthma which would have justified disability retirement in 1946.
38. Army Correction Board. On August 12, 1953, plaintiff filed an application with the Army Board for Correction of Military Necords contending that he should have been retired for physical disability due to asthma, rhinitis and sinusitis. It raised the question, among others, as to whether he was entitled to disability retirement at the time of his release in 1947, by reason of his World War II medical record. The application stated therein that plaintiff desired to appear before the Board, but that plaintiff did not desire to have witnesses appear in person in support of his application. By letter dated September 8, 1954, plaintiff was advised that “A thorough examination of your military records, together with the information submitted, fails to reveal any evidence of error or injustice in your records. Therefore, the Board has concluded that there is no justification for a formal hearing and review of your case.”
39. Army Correction Board. During the pendency of plaintiff’s application before the Correction Board, the Acting Executive Secretary of the Board wrote the following letter to the Physical Standards Division of the Surgeon General’s office on June 8,1954:
1. Beference is made to the inclosed application for correction of military records of Daniel P. Ferguson, *338 0 342 528, wherein, he requests that his records be corrected to show that he was retired by reason of physical disability on 29 March 1950, the date of his relief from active duty not by reason of physical disability.
2. Applicant’s military records indicate that upon undergoing physical examination on 15 March 1950 he was found physically qualified. However, effective 14 July 1951, he was transferred from the active reserve to the inactive reserve, having been found physically unqualified for extended active duty due to asthma, which defect had been known to the military authorities since WWII service.
3. The Veterans Administration has awarded applicant the following ratings for service connected disabilities: 10% for asthma, bronchial, effective 13 October 1947; 10% for sinusitis, maxillary, effective 4 December 1952; combined rating, 20% effective 4 December 1952.
4. The records disclose that on 2 October 1952 the Surgeon General’s Office advised the Adjutant General that as of 15 March 1950, applicant did not have sufficient physical disability to warrant his apearance before a Physical Evaluation Board. However, in consideration of the contents of paragraphs 2 and 3 above, comment and opinion is requested as to whether or not he was eligible for retirement by reason of physical disability on 29 March 1950. Such individual’s VA records may be obtained by calling Mr. Causey, extension 72515. Should it be deemed necessary that applicant appear before a Physical Evaluation Board, it is requested that your reply so indicate. It is further requested that the inclosures be returned with your comment.
40. Army Correction Board. On August 25, 1954, the Executive Secretary of the Correction Board wrote a letter to the Army Physical Review Council which read in part as follows:
1. Reference is made to the inclosed application for correction of military records of Daniel P. Ferguson, O 342 528, wherein it is requested that his records be corrected to show that he was retired by reason of physical disability on 29 March 1950.
2. The records show that subject was last relieved from a tour of extended active duty on 29 March 1950, not by reason of physical disability. However, on 5 April 1951 he was found to be physically disqualified for extended active duty because of a history of bronchial astlnna and rhinitis, chronic, seasonal. He performed a tour of active duty from 18 to 30 June 1951, but on 14 July 1951 *339 was transferred from the Active Reserve to the Honorary Reserve, having been found physically disqualified for retention in the Active or Inactive Reserve.
41. Army Correction Board. By letter dated February 5, 1955, plaintiff resubmitted his application to the Army Board for Correction of Military Records and stated therein that no explanation was given by the Board as to its earlier denial.
42. Army Correction Board. On February 21, 1955, the Executive Secretary of the Correction Board wrote as follows to the plaintiff:
Reference is made to your letter of 5 February 1955 concerning your application to this Board, dated 28 April 1953, in which you requested that you be granted retirement by reason of physical disability.
Your statement in such letter to the effect that you do not understand why the Board denied your application comes as somewhat of a surprise inasmuch as it is believed that the Board’s position in this matter was fully explained to you at the time of your visit to this office. However, it is believed that the following will further clarify the reasons for the action taken by this office.
The administrative procedures established by the Secretary of the Army for the guidance of the Army Board for Correction of Military Records provide that an application for a hearing by the Board may be denied where a sufficient basis for review has not been established.
An examination of your pertinent Army records disclosed that you were relieved from active duty 12 October 1947 not by reason of physical disability. You were recalled to extended active duty 22 October 1948 and following a physical examination on 28 October 1948 you were considered to be physically qualified for general service. On 15 March 1950 you were found physically qualified and your relief from active duty on 29 March 1950 was not by reason of physical disability. A review of your case by the Surgeon General’s Office on 2 October 1952 resulted in the finding that you had insufficient physical disability on 15 March 1950 to have warranted your appearance before a Physical Evaluation Board. Your records were again reviewed by the Surgeon General’s Office on 15 June 1954 at which time it was stated that you were not eligible for physical disability retirement on 29 March 1950. The fact that more than a year after your relief from active duty you were found to be physically disqualified for retention in *340 the active or inactive reserve has no bearing, upon your request for retirement by reason of physical disability.
Following your visit to this office your records were.referred to the Army Physical Review Council for review and on 31 August 1954 that office reported that you did not have a ratable disability on 29 March 1950. In consideration of the foregoing it was concluded that you were not eligible for retirement by reason of physical disability since you were not physically unfit to perform the duties of your office, grade or rank at the time of your relief from active duty. Because justification for a formal hearing and review of your case by the Board had not been established, your application was denied.
Inasmuch as your letter of 5 February 1955 contains no evidence not previously considered, no further action on your application is contemplated.
43. Army Correction Board. Plaintiff complained in writing to the Office of the Inspector General and to the Office of The Joint Chiefs of Staff over his transfer to the Honorary Reserve and the denial of his claim for disability retirement. As a result thereof, the Army Board for Correction of Military Records, under date of December 6, 1955, advised, in part, as follows:
The Board reports that following receipt of Major Ferguson’s original application for correction of his military record, a review of his record as well as the evidence submitted by him revealed that he was relieved from active duty 12 October 1947 not by reason of physical disability. He was recalled to extended active duty 22 October 1948 and on 29 March 1950 was again relieved from active duty not by reason of physical disability, having been found physically qualified on 15 March 1950. A review of his case by The Surgeon General’s Office on 2 October 1952 resulted in the finding that on 15 March 1950 he had insufficient physical disability to have warranted his appearance before a physical evaluation board. His records were again reviewed by The Surgeon General’s Office on 15 June 1954, at which time that office stated that he was ineligible for physical disability retirement on 29 March 1950. The Army Physical Review Council reviewed his case on 31 August 1954 and reported that he did not have a ratable disability on 29 March 1950.
As concerns Major Ferguson’s having been found physically disqualified for retention in the active or inactive reserve and transferred to the honorary reserve *341 in 1951, the Board states that such action was not inconsistent with the finding that he was physically qualified for retention on active duty in 1950. In this respect, the application of physical standards in determining whether an officer is physically qualified for retention in the active or inactive reserve and for entry on active duty is necessarily more rigid than in applying the standards as regards retention or separation of officers already on active duty.
In consideration of the foregoing, the Board concluded that the facts of Major Ferguson’s case presented insufficient evidence of probable material error or injustice in his failure to be retired by reason of physical disability at the time of 'his last relief from active duty, and, in accordance with the regulations governing the operation of the Board, denied his application without a formal hearing. The Board subsequently reconsidered his case and found no evidence to warrant a change in its previous determination.
Since the evidence forwarded to you by Major Ferguson is similar to that previously considered, the Board believes that further action on his application is not justified at this time. However, he is privileged at any time to submit to the Board for consideration new and material evidence not previously considered.
44. Veterans Administration examination, December 1957. Plaintiff was examined by Veterans Administration on December 3,1957. A special pulmonary examination disclosed the following:
History: This is a 46 year old white male veteran, who, in 1944, had his first episode of difficult breathing with wheezing. _ From that time till this he has had intermittent episodes which are more frequent in the fall and spring of the year, of wheezing, difficulty in breathing, and associated intermittent episodes of sinusitis, postnasal drip and numerous medications for these associated ENT problems. Over the years, he has not had any increased instance of pneumonia or chest colds, has never had hemoptysis and functionally, when he is free of an asthmatic episode, is fully able to take three flights of stairs and do everjdhing that is required in his duties as deputy sheriff. He has taken no medications for his asthma although takes neosynephrine, ephedrine and phenobarbital for his nasal congestive difficulties. Since he discontinued smoking cigarettes five years ago, he has been considerably improved.
*342 Physical Examination: At this time, physical examination reveals normal vital signs. There is no cyanosis and no clubbing. Examination of the ventilatory dynamics show excellent expansion of the chest and excellent mobility of the chest cage. The abdomen is flat. The diaphragm moves extensively. Auscultation throughout the chest is completely negative. There are no wheezes and no rales can be heard. A2 is much greater than P2 and the heart sounds are otherwise normal.
Diagnosis: Chronic bronchial asthma, by history; no evidence of disease at this time.
45. Veterans Administration rating, December 1957. Under date of December 16,1957, plaintiff was rated by the Veterans Administration as follows:
Code 1 Incurred Wff II VR 1(a) Pt I Par 1(a) 10% from 12-4-52
6513 SINUSITIS, MAXILIARY, CHR 10% from 10-13-47 to 2-15-58 0%from 2-16-58 BRONCHIAL ASTHMA, CHR, HISTORY OP 0% from 10-13-47 SCAR APPENDECTOMY
Code 1 Incurred PTE VR 1(a) Pt II Par 1 (a) 0% from 10-13-47 SCARS, PACE, RT EAR & LT SCALP; FRACTURE, 6th RIB, RT
COMB: 20% from 12-4-52 to 2-15-58 10% from 2-16-58
Code 8 Not service incurred or aggravated PTE & WW II LT KNEE & NECK INJURY
Code 32 NO COMBAT TAR 1009 (E) No 2507
46. Prívale sinus examination, July 1961. At the request of plaintiff’s physician, plaintiff’s sinuses were privately X-rayed on July 21, 1961, and it was reported as follows:
Clinical Information: Chronic hayfever and postnasal discharge.
_ Sinuses: Moderate thickening of the right maxillary sinus membrane is noted. The right maxillary sinus is generally smaller than that on the left. An air fluid level is not demonstrated. The ethmoid, frontal and sphenoid sinuses show no abnormality.
Impression: Right maxillary sinusitis.
47. Putative cause of sinusitis. Plaintiff formerly was a boxer and in 1932 incurred a broken nose while boxing in -Salt Lake City, Utah. There is medical testimony in the case that *343 it would be pretty hard for a boxer not to have a deviated nasal septum, that plaintiff’s broken nose could be the cause of his deviated nasal septum, that a broken nose may predispose to sinusitis, and that plaintiff’s problem with his nose could easily have been the result of his boxing experiences.
48. Marmol for Officers used by Surgeon General in disability cases. Prior to October 9, 1953, the Department of the Army had no published medical standards of fitness or unfitness for the retention of officers on active duty. However, a “Manual For Officers In The Disposition and Retiring Board Branch of The Physical Standards Division of The Surgeon General’s Office” had been developed in the Office of the Surgeon General because all cases were reviewed at that time in the Physical Standards Division of the Surgeon General’s Office. The Manual was used as a guide in judging disabilities, and set forth certain standards for retention to be used in adjudicating applications for retirement on grounds of physical disability (see Howard C. Smiley v. United States, 156 Ct. Cl. 463, 475 (1962). The Manual is in evidence as Defendant’s Exhibit 1.
49. Relevant Regulations:
AR 40-105, October 29,1946
AR 40-115, August 20,1948
AR 40-1025
AR 15-160
AR 40-100, April 8,1946
AR 140-5, June 17,1941
War Department Technical Manual 12-245, October 1, 1945
AR 140-120, February 20,1950
AR 605-250, March 28,1944
Special Regulations 40-120-1, October 9,1953
In the interest of brevity, the texts of the excerpts from the above publications are not reprinted in this report, although they appear in the respective requested findings of the parties which are part of the court’s record.
50. Dr. Peck.
(a) Dr. George A. Peck, a Salt Lake City specialist in allergy, testified on behalf of plaintiff. He examined plaintiff in June 1961 with positive findings limited to moderate nasal congestion, marked deviation of the nasal septum to *344 the left; some hypertropic turbinates; and impairment of the sinuses on trans-elimination. He was unable to make any objective findings as to plaintiff’s alleged asthma because plaintiff was not in an asthmatic attack at the time of the examination. There are two general types of asthma— the chronic, persistent type which the patient has all the time, and the intermittent or episodic type in which there are periods of remission lasting from hours to months. In this latter type during periods of remission no diagnosis of asthma can usually be made on the basis of objective findings because the condition does not necessarily leave traces. For example, during periods of remission an asthmatic’s lungs are frequently clear, vocal and tactile fremitus are normal, and no rales are heard. Therefore, the diagnosis in such cases frequently must be made on the basis of history. Failure of a person to yield asthmatic findings on examinations made during periods of remission does not affect the actuality of his asthmatic condition at other times during periods of exacerbation. As a general rule extremes of temperature, particularly of cold and of excessive humidity, are poorly tolerated by asthmatics. The tendency for attacks to occur during sleep is one of the characteristic features of asthma. The condition is aggravated by exertion, climate, infections and assorted allergies. On the basis of extensive experience throughout World War II as a medical officer in the Air Force, Dr. Peck stated that it was felt by Army doctors that there was no place in the service for asthmatics, because during an attack of asthma the patient cannot tolerate any form of exertion due to an oxygen deficiency in the system.
(b) On the basis of an examination of plaintiff’s military medical records from April 1944 to July 1947 Dr. Peck stated that the only diagnosis that could have been made in 1947 of plaintiff’s chest condition was asthma. He felt that plaintiff unquestionably developed asthma in line of duty and that it was aggravated 'by service. He expressed the opinion that, by hindsight, the plaintiff should have had a more thorough examination for asthma in 1947 and a more definitive diagnosis at that time.
(c) The plaintiff’s deviated septum was the probable result of his experience as a boxer in earlier years. A deviated *345 septum rarely causes asthma, but it sometimes aggravates it.
51. Dr. BatelAffe.
(a) Colonel Harold Elton Eatcliffe, Army Medical Corps, who was at time of trial serving at Walter Eeed Army Hospital as Chief of the Allergy Service and Chief of the OutPatient Department, testified as a witness for defendant. He testified that from an examination of the records in the case, it was his opinion that the degree of plaintiff’s asthma would be mild to moderate, that emphysema is considered to be quite a common complication in moderate to severe asthma, varying with its duration, frequency and severity, and that he found no evidence in the record to indicate the existence of any pulmonary emphysema. He testified that the Veterans Administration examination of May 18, 1948, indicated that there was no physical or clinical evidence of pulmonary disease at the time of the examination, and that the X-ray report of the lungs was negative. He further testified that there are men currently performing active military service that have been diagnosed with sinusitis and asthma. Colonel Eatcliffe was of the opinion that a broken nose may predispose to sinusitis.
(b) Dr. Eatcliffe agreed with Dr. Peck that episodic or intermittent asthma will usually produce negative physical findings during periods of remission, and that the most frequent type of asthma is episodic. Thus during periods of remission an asthmatic could have a normal or even greater vital capacity (i.e., quantity of air expelled from lungs) than an average person, as the plaintiff did in October 1948 during an examination by the Veterans Administration.
52. Dr. Tedder.
(a) Lt. Colonel Henry C. Vedder, Army Medical Corps, who was at time of trial assigned to the Surgeon General’s Office as Chief, Eetirement Disposition Section, and as Assistant Chief, Physical Standards Division, also testified as a witness for defendant. During the years 1946 to 1949, he had also been with the Physical Standards Division of the Surgeon General’s Office doing retirement work. Dr. Ved-der testified that in 1947 there were no published retention standards or retention regulations setting forth medical *346 standards of fitness and unfitness for retention on active duty, and that the Surgeon General’s Office was then using an unpublished office manual, “The Manual for Officers In The Disposition and Retiring Board Branch of The Physical Standards Division of The Surgeon General’s Office” as a guide in judging disabilities. Dr. Vedder testified in part as follows:
The WitNess : I am of the opinion that he [plaintiff] was fit for active service at the time of his separation. His first release was 12 October 1947 and he reapplied for active duty on 21 July 1948 and underwent a medical examination for this. At this time he gave no history of having asthma or hay fever at this time, or sinusitis, and he was put on extended active duty and in his own mind he must have felt he was fit for active duty at that time, and he performed active duty without complaint and was only separated because of a reduction in force. When he was separated he made no complaint of asthma, so here is the second tour of service which he performed without any difficulty whatsoever.
It so happens he was disqualified for the reserve because of the regulation AR [1] 40-120, which stated the reserve would be screened under a procurement regulation, AR 40-105, and when they screened his whole case and found out he had asthma he did not meet procurement for asthma. The procurement standards are more strict than retention standards because a person is an individual; he is supposed to deteriorate to some degree, depending on how long they are on duty.
COMMISSIONER Bernhardt: Wasn’t it the procurement standards that applied to his re-entry into the service in 1948 ?
The Witness : That is true, but he didn’t tell them he had asthma and they had no way of guessing it, and he had no complaints or no history of asthma or sinusitis and he came into the service and served again another tour and when he went out he didn’t complain on his separation physical either. Actually, he would have liked to have stayed in the service, and his main complaint came when he was disqualified from the reserve by using a procurement regulation.
(b) Dr. Vedder stated that under the standards in use in 1947 the Army “didn’t retire anybody for any minor conditions. They either had to be incapacitated or they were fit for active duty.” At that time mild conditions in general *347 were, lie said, not considered as permanently unfitting for active military duty. The person had to be so unfit as not to be able to pursue his employment, and the incapacity had to be permanent. In 1947 the Army did not adhere to the principle that a person fit for limited duty was not fit for active duty. He does not agree that a man with a history of asthma cannot be safely sent to any part of the world to perform duties in peace or war, depending on his particular duty assignment. In 1947 the Army did not consider itself to be bound by War Department Technical Manual 12-245, because it did not set retention standards but was merely a procedural guide.
53. Plaintiff’s post-service civilian employment. Plaintiff is presently employed as a Salt Lake County, Utah, Deputy Sheriff, and has been so employed since July 1950, except for a six months period in 1957 when he was working for the Skyline Oil Company as a landman for the Oil and Gas Land Leasing Company.
CONCLUSION OP LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover on his claim for disability retired pay, and, therefore, as to such claim his petition is dismissed.*

 At trial plaintiff testified that lie had not either been asked nor did he deny a history of asthma, hay fever, etc.

Plaintiff’s motion for leave to amend Ms petition, pursuant to Rule 22(b), to conform to the evidence and findings of the court, or pursuant to Rule 22(a), was granted by order of October 16, 1964, and the case remanded to the trial commissioner for further proceedings.